**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**LOUIS BASSON VAN ROOYEN**
1 Brown Street
Philadelphia, PA 19123
               *Plaintiff,*

          **vs.**

**BRI STERN**
7316 Santa Monica Boulevard
West Hollywood, CA 90046
               *Defendant.*

NO.

CIVIL ACTION

JURY TRIAL DEMANDED

---

## CIVIL ACTION COMPLAINT

Plaintiff, Louis Basson van Rooyen, by and through his attorney, files this Complaint against Bri Stern and avers as follows:

### I.  Introduction

1. Plaintiff has initiated the instant action to redress malicious and unfounded accusations made by Defendant concerning Plaintiff's conduct and reputation. These baseless allegations publicly made by Defendant Stern in a posting on the internet, hereto attached and incorporated as Exhibit 1, accused the Plaintiff of fraud, theft, recidivist criminal conduct, dishonesty, deception, and scamming. Having failed to extort thousands of dollars from the Plaintiff, Defendant launched a defamatory campaign against him on social media designed to permanently destroy his reputation by falsely accusing him of serial criminal conduct. The Plaintiff is 22 years old with immense promise and potential. Defendant's slander started some 2 or 3 weeks ago but metastasized on April 22, 2022, into a full-fledged libelous campaign on social media designed to cause irreparable damage to Plaintiff's reputation. Because the Defendant's false allegations are so damaging, Plaintiff has contemporaneously filed a petition for a Temporary Restraining Order (TRO) with

this Complaint. As argued *infra,* Plaintiff satisfies the necessary prerequisites to justify this Court's immediate intervention.

## II.  Jurisdiction and Venue

2.      United States District Court for the Eastern District of Pennsylvania may exercise original subject-matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1332 in that the Court has original jurisdiction over all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states. In this case, Plaintiff is a citizen of the Commonwealth of Pennsylvania and Defendant is a citizen of the United States.

3.      Venue is properly laid in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §§ 1391(a)(2) because a substantial part of this case, giving rise to Plaintiff's claim, occurred in this judicial District. In this case, Defendant's actions took place in the Eastern District of Pennsylvania and in this District affected Plaintiff's reputation and his economic and athletic prospects.

## III.  Parties

4.      The foregoing paragraphs are incorporated herein as if set forth in full.

5.      The Plaintiff, Louis Basson van Rooyen, is an adult individual and a citizen of the Commonwealth of Pennsylvania with the address set forth in the caption.

6.      The Defendant, Bri Stern, is an adult individual and a citizen of the State of California with the address set forth in the caption.

## IV.  **Factual Background**

7.      The foregoing paragraphs are incorporated herein as if set forth in full.

8.      Plaintiff is Louis Basson van Rooyen (hereinafter referred to as 'Plaintiff' or 'Louis'), a permanent resident of the United States.

9.      Plaintiff is 22 years old.

10.      Plaintiff is also a citizen of the Republic of South Africa.

11.      Plaintiff came to the United States as a student-athlete on a New Mexico State University scholarship.

12.      Very soon thereafter, Plaintiff transferred to Texas A & M University to play golf for the University and study for a Bachelor of Science degree in Actuarial Science and Mathematics.

13.      Plaintiff is originally from a wine district town called Stellenbosch, where his parents and relatives still reside.

14.      Plaintiff's father is a retired attorney and previous state prosecuting attorney in South Africa.

15.      Plaintiff's mother is a renowned neurologist.

16.      Plaintiff was brought up with strong moral values and has never been in legal trouble.

17.      Plaintiff has never been accused of criminal or civil illegality by any arm of law enforcement, either in the United States or in South Africa.

18.      Plaintiff, pursuant to his specific major, acquired the knowledge to code computer programs based on risk, math, and finance.

19.     The conduct of the Defendant, as set forth herein, has affected not just the Plaintiff's personal and professional reputation, but also the reputation of his family, including, but not limited to Plaintiff's cousin, who carries the Plaintiff's last name and is one of the top 50 professional golfers in the world.

20.     Plaintiff first met Bri Stern (hereinafter referred to as 'Defendant' or 'Ms. Stern') at a restaurant with a group of friends.

21.     Ms. Stern describes herself as a 'model' and 'influencer.'

22.     Throughout the next few weeks, Plaintiff and Defendant engaged in a relationship.

23.     Plaintiff soon realized that he and Defendant were incompatible.

24.     Specifically, Plaintiff discovered that Defendant consistently used cocaine and a drug called 'blow.'

25.     Further, Plaintiff discovered pornographic content online featuring Defendant.

26.     Before Plaintiff ended the relationship, Ms. Stern had allegedly been offered a modeling shoot out-of-state.

27.     She requested Plaintiff to look after her dog in her apartment while away.

28.     Plaintiff agreed, and Defendant gave him a key tag to enter and exit her apartment.

29.     While Defendant was away, Plaintiff took care of her dog and stayed a single night in her apartment.

30.     During his time there, Plaintiff asked Ms. Stern if he could clean her apartment because it was dirty and cluttered.

31.     Ms. Stern eagerly consented.

32.     In order to clean the floors and surrounding areas, he moved a small black safe from the one wall of the living room area to the top of a chair while he mopped, cleaned the floor, and then moved the safe back to a corner.

33.     Plaintiff made Ms. Stern aware of what he had done.

34.     The next day Ms. Stern returned, and Plaintiff drove to Los Angeles Airport to pick her up.

35.     The couple drove back to her apartment, where Ms. Stern expressed gratitude for Plaintiff having cleaned her apartment.

36.     The next day, Plaintiff left for Philadelphia to do preparation work for golf.

37.     Plaintiff used this opportunity to re-evaluate his relationship with Ms. Stern.

38.     After a few days of not contacting her, Plaintiff called her and told her he was not interested in a relationship.

39.     One week later, Defendant texted, called, emailed, and messaged Plaintiff accusing him of stealing cash from her safe.

40.     Defendant first accused him of stealing the sum of $20,000.

41.     Defendant then accused him of stealing the sum of $29,000.

42.     Finally, Defendant accused him of stealing $47,000 in cash from her safe.

43.     Plaintiff never stole any money from Ms. Stern.

44.     Plaintiff did not have the code to Defendant's safe.

45.     Plaintiff has never stolen anything from anyone at any time.

46.     Ms. Stern told Plaintiff that she had "video footage" of Plaintiff's theft.

47.     Since Plaintiff had never stolen any money, Plaintiff knew she was lying.

48.     Meanwhile, Plaintiff continued to protest his innocence.

49.     Defendant told Plaintiff she had opened multiple federal cases against him at the LAPD.

50.     Defendant accused Plaintiff of running from the law and told others there was a warrant for his arrest.

51.     Plaintiff soon confirmed that no charges had been filed against him, and there was no warrant.

52.     Defendant pledged to remove and withdraw the 'criminal case' against Plaintiff if he gave her thousands of dollars in cash.

53.     Defendant threatened that if she were not paid, she would have Plaintiff deported because he was a green card holder, and her accusation of criminal activity would be a basis for deportation.

54.     Defendant's threats of deportation seriously destabilized Plaintiff.

55.     Plaintiff had worked hard to be in a position to maximize his potential in the United States, something he could not do in South Africa due to corruption and injustice.

56.     Plaintiff was granted a green card because of his education and the contribution he was likely to make to the United States.

57.     In an attempt to buy time, Plaintiff said he would pay Defendant money, not because he was guilty of anything but to prevent her from having him deported.

58.     Plaintiff made a specific point of denying ever taking money-or anything else-from Defendant.

59.     As Defendant realized that Plaintiff was delaying paying her, she continued to extort him.

60.     Defendant's pattern of extortion through text messages is attached and incorporated herein as Exhibit 2.

61.     Plaintiff started to receive texts and calls from Defendant and her friends, threatening to defame him all over social media using the malicious content they had created in Exhibit 1.

62.     Defendant and her friends threatened to connect the false criminal accusations with Plaintiff's photograph, name, and surname if he did not give Defendant fifty thousand dollars ($50,000) in cash by a specific time.

63.     Plaintiff attempted to humor Defendant to buy himself enough time to seek legal advice.

64.     Plaintiff was sent numerous examples of defamatory postings which would be placed on social media if he did not pay the sum of money Defendant was demanding.

65.     Among the false accusations was a narrative accusing Plaintiff of attempting to steal a Ferrari from an acquaintance called Frankie Delgado (hereinafter referred to as 'Delgado'), notably not by Delgado.

66.     It was alleged that Plaintiff had attempted to steal the Ferrari (hereinafter referred to as 'vehicle') by a down payment of $50,000 in a cashier's check, which he then fraudulently withdrew.

67.     The implication was that Plaintiff would pay nothing for the Ferrari, get possession, and drive off with the stolen vehicle.

68.     Plaintiff indeed agreed to purchase the car from Delgado.

69.     Delgado, however, failed to send the Plaintiff any of the car's history, service record, and provenance.

70.     Plaintiff discovered on his own that the vehicle had been in a crash, contrary to Delgado's representations.

71.     Plaintiff never drove the vehicle.

72.     Plaintiff never had possession of the vehicle.

73.     Plaintiff had opted to pay for the vehicle from his International FNB accounts.

74.     The wiring of monies from that account could take up to 7 days.

75.     Delgado, however, continually pressed Plaintiff for a check allegedly because he needed money right away.

76.     Plaintiff then opted to write a check from his US-based Chase private client account.

77.     However, this check was not a cashier's check.

78.     After Plaintiff discovered the problems with the vehicle, he requested his bank to block the check and told Delgado why.

79.     Delgado had no problem with Plaintiff's decision.

80.     Months later, when Defendant found out about the story, she twisted the facts to make Plaintiff look guilty of fraud, thereby adding credibility to her prior accusations.

81.     Defendant then created yet another false narrative involving Plaintiff.

82.     Defendant accused Plaintiff of having stolen a bottle of alcoholic beverage (Defendant provided no specifics as to the precise beverage) from a night club after which there was a physical altercation leading to Plaintiff being thrown out of the nightclub.

83.     These events never happened.

84.     Plaintiff told Defendant that video from the nightclub would show that he neither stole nor was thrown out.

85.     Plaintiff has the opportunity to be a Forbes under 30 athlete.

86.     Plaintiff has the opportunity to be a candidate for the Forbes under 30.

87.     Assisted by the tools and skills learned during his undergraduate degree in actuarial science and mathematics, Plaintiff created investment software.

88.     Plaintiff then sold this software to a blue-chip investment Company.

89.     Because of his proven track record in golf, Plaintiff has been requested to participate in a PGA Tournament.

90.     Sponsors such as Rolex have endorsed Plaintiff.

91.     Plaintiff spoke about his prospects with Defendant.

92.     After Plaintiff's counsel was retained, he contacted Defendant's counsel to discuss the issues raised in this Complaint.

93.     Defendant's counsel represented that he would send the text messages between Plaintiff and Defendant.

94.     Plaintiff was able to extract the text message exchanges himself and they are attached hereto and incorporated herein as Exhibit 2.

95.     On April 22, 2022, Defendant suddenly and without warning posted on her Instagram account, the attached documents, collectively marked as Exhibit 1

96.     Exhibit 1 is the equivalent of an Internet 'Wanted Poster.'

97.     Plaintiff's photograph and name are prominently displayed.

98.     The Exhibit has the words 'SCAM ALERT! in white block capital letters against a red background.

99.     Readers are told to 'Beware'.

100.    Plaintiff is described as a 'con artist creating a fraudulent wire transfer documents in order to steal items and money from the people of LA.'

101.    Readers are told that Plaintiff 'created a fake $300,000 wire in an attempt to steal one of my friend's Ferrari's.'

102.    The Exhibit states that Plaintiff 'pretends he is a professional golfer and part of Forbes 30 under 30 to lure girls in as his next targets, so PLEASE be careful and do not fall for it.'

103.    The document goes on 'If you have any additional info on his latest scams a whereabouts, please DM or contact the LAPD.'

104.    The reader is told to 'please SHARE this story (to prevent other people from being victims of fraud).

105.    This first posting clicks to a second posting which again contains another picture of the Plaintiff.

106.    This second posting states; I believe his signature moves are fake investments, writing bad checks, and creating fraudulent wire transfer documents.'

107.    The second posting describes again, this time in different verbiage, the Plaintiff's attempt to steal the Ferrari.

108.    It states that 'Louis wrote my friend a bad check for $300,000 and begged my friend to just let him test drive it so he could "propose to his girlfriend"-an excuse to attempt to steal the car."

109.    There is a click to a next featuring the Defendant and referencing a further link which when clicked goes to another blonde woman, listed as "The Stock Bunny", unknown to the Plaintiff, repeating aspects of the defamation.

110.     Following Defendant's posting of Exhibit 1, Plaintiff has received death threats and threats of physical violence. See Exhibit 3 attached hereto and incorporated herein.

111.     Exhibit 1 is continually being read and reposted.

112.     Defendant specifically asked anyone reading Exhibit 1 to repost it.

113.     Exhibit 1 is accessible to all individuals worldwide via the internet.

114.     Defendant's criminal allegations against Plaintiff, as described in Exhibit 1, are false, malicious, damaging, and irreparably damaging to Plaintiff's reputation and his athletic and commercial prospects.

115.     Plaintiff has never committed the criminal acts alleged by Defendant.

116.     Defendant deliberately, recklessly, and maliciously published and had republished the preceding false and defamatory information contained in Exhibit 1.

117.     The actions by Defendant entailed communications on Instagram that continue to be defamatory.

118.     Plaintiff has requested Instagram to take Exhibit 1 down, but that has not yet occurred.

119.     The foregoing actions by Defendant entail communications that result in special harm to Plaintiff.

120.     The foregoing actions by Defendant are an abuse of any conditional privilege that may have applied (the existence of any such privilege is expressly denied).

121.     Defendant knew the content of Exhibit 1 was false when she published it.

122.     Defendant published the false content of Exhibit 1 either intentionally or maliciously, with reckless disregard for its truth or falsity.

123.   As a direct and proximate result of Defendant's false publications as aforesaid, Plaintiff's good name and reputation have been and continue to be irreparably damaged.

124.   As a direct and proximate result of Defendant's false publications as aforesaid, Plaintiff's athletic and commercial prospects may be irreparably harmed.

125.   Plaintiff has been brought into scandal and reproach because of the foregoing false content of Exhibit 1 and its printing, publication, and circulation (both past and ongoing).

126.   The Plaintiff is being held up to scorn and contempt among friends, business acquaintances, and other members of the public because of the printing, publication, and circulation of Exhibit 1 and additional false statements made by the Defendant's friends

127.   As a direct and proximate result of Defendant's conduct, Plaintiff's reputation is being damaged, possibly permanently and adversely affecting his ability to benefit from economic and athletic prospects.

128.   As a result of the defamatory conduct of Defendant, Plaintiff may be sustaining significant financial harm.

129.   As a result of the defamatory conduct of Defendant, Plaintiff is suffering severe emotional distress.

130.   Unless immediately stopped, Plaintiff's reputation will be irreparably damaged.

131.   Plaintiff's athletic and economic prospects may be permanently ruined unless immediately stopped.

132.   Damages alone are insufficient to remedy the conduct described above.

133.   The Damages will continue absent equitable relief.

134.   If Defendant is permitted to continue her wrongful conduct as aforesaid, the Plaintiff will suffer irreparable harm as follows:

a.     Plaintiff's reputation will be irreparably harmed, and this damage on social media will be impossible to rectify and remain on the internet forever.

b.     Plaintiff's athletic prospects and sponsorships will be removed because no organization or company will take the risk of sponsoring a criminal or someone who has been accused of criminal activity.

c.     Plaintiff may have to face an immigration tribunal wherein he would have the burden of demonstrating his moral character and innocence.

d.     Plaintiff's economic opportunities will be withdrawn on the mere suspicion that Plaintiff is a scammer, fraudster, and/or a career criminal.

**e.**     The reputation of Plaintiff's relatives with the same name as Plaintiff may be irreparably damaged by association

.

## COUNT I

## DEFAMATION- SLANDER

135.     The averments of the foregoing paragraphs are hereby incorporated by reference as if set forth fully herein.

136.     Before and after the publication of Exhibit 1, and continuing to this day, Defendant verbally informed her friends, acquaintances, and public members that Plaintiff had stolen cash from her safe and attempted to steal a Ferrari.

137.     Before and after the publication of Exhibit 1, and continuing to this day, Defendant verbally informed her friends, acquaintances, and public members that she was pressing criminal charges against Plaintiff for stealing money cash from her safe.

138.    Before and after the publication of Exhibit 1, and continuing to this day, Defendant told her friends, acquaintances, and public members that Plaintiff was a scammer fraudster, career criminal, and confidence trickster.

139.    Before and after the publication of Exhibit 1, and continuing to this day, the Defendant told her friends, acquaintances, and public members that Plaintiff was on the run from the police and there was a warrant for his arrest.

140.    Defendant's complaints to others in the community about Plaintiff's alleged criminal conduct, as set forth in detail *supra,* were intentionally and/or recklessly false and inflammatory.

141.    Defendant knew her allegations were false.

142.    The information verbally disseminated by Defendant, as referenced *supra*, was defamatory because it harmed Plaintiff's reputation, lowered him in the estimation of the community, and deterred third persons from associating or dealing with him.

143.    Defendant's defamatory statements specifically referenced Plaintiff by name.

144.    Therefore, listeners are defamatory statements and understand that they applied to Plaintiff.

145.    Any listener of the defamatory statements would understand their defamatory meaning.

146.    Any listener of the defamatory statements would understand an intent by Defendant to apply the statements to Plaintiff.

147.    As a direct and proximate result, Plaintiff has sustained personal injuries, including but not limited to depression, anxiety, insomnia, irreparable damage to his reputation, and loss of standing in the community.

148.     Plaintiff continues to sustain these injuries due to the ongoing and widespread dissemination of Defendant's falsehoods.

149.     Defendant's portrayal of Plaintiff was reckless, willful, malicious, and so extreme and outrageous to warrant the imposition of punitive damages.

**WHEREFORE**, Plaintiff seeks the damages set forth in the *Ad Damnum* of the Complaint, *infra*.

## COUNT II

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

150.     The averments of the foregoing paragraphs are hereby incorporated by reference as if set forth fully herein.

151.     Defendant's conduct was extreme and outrageous because, despite knowing that Plaintiff was innocent, she publicly described, identified, and named Plaintiff as a perpetrator of numerous crimes, including but not limited to theft and attempted theft.

152.     Defendant's conduct was intentional, malicious, and caused severe emotional distress.

153.     As a direct and proximate result, Plaintiff has sustained personal injuries, including but not limited to depression, anxiety, isolation, and insomnia.

154.     Defendant's infliction of emotional distress was reckless, willful, malicious, extreme, and outrageous to warrant the imposition of punitive damages.

**WHEREFORE**, Plaintiff seeks the damages set forth in the *Ad Damnum* of the instant Complaint, *infra*.

## COUNT III

## FALSE LIGHT INVASION OF PRIVACY

155.     The averments of the foregoing paragraphs are hereby incorporated by reference as if set forth fully herein.

156.     Defendant intentionally and/or recklessly made false and inflammatory statements intimating that Plaintiff was a career criminal who had engaged, for many years, in scamming innocent victims.

157.     Defendant intentionally and/or recklessly communicated to the public that there was a warrant out for Plaintiff's arrest, indicating that there was probable cause to arrest him or he was on the run from the law.

158.     Defendant intentionally and/or recklessly communicated to the public that they were to notify the LAPD of Plaintiff's whereabouts, indicating he was a wanted felon.

159.     Defendant's statements, assertions, suggestions, innuendo, implications, and statements about the Plaintiff would be highly offensive to a reasonable person.

160.     Those statements implied that Plaintiff was immoral, criminal, felonious, predatory, and neglectful.

161.     Defendant knew and acted in reckless disregard of the truth or falsity of the publicized matter and the false light in which Plaintiff would be placed.

162.     As a direct and proximate result, Plaintiff has sustained personal injuries including but not limited to depression, anxiety, isolation, insomnia, irreparable damage to his reputation, and loss of standing in the community.

163.     Plaintiff continues to sustain these injuries due to the ongoing and widespread dissemination of Defendant's falsehoods.

164.    Defendant's portrayal of Plaintiff was reckless, willful, malicious, and so extreme and outrageous to warrant the imposition of punitive damages.

## COUNT IV

## DEFAMATION- LIBEL

165.    The averments of the foregoing paragraphs are hereby incorporated by reference as if set forth fully herein.

166.    The publication of Exhibit 1 on the internet continues to this day.

167.    In Exhibit 1, created and disseminated by the Defendant on the Internet, Defendant states, as a fact, that Plaintiff is a con artist scamming women, committing wire fraud, theft, and attempted theft.

168.    Defendant published to the public that Plaintiff had stolen cash from her safe and attempted to steal a Ferrari.

169.    Exhibit 1 implies that Plaintiff is a career criminal on the run from the law.

170.    The Defendant's criminal accusations set forth as fact in Exhibit 1 are intentionally and/or recklessly false and inflammatory.

171.    Defendant knows her allegations are false.

172.    The Defendant' has published Exhibit 1 on Instagram and possibly other social media sites.

173.    The Defendant has requested anyone reading Exhibit 1 to repost it, so the maximum number of people can read the defamatory material.

174.    The defamatory material references Plaintiff because his name is mentioned, and his picture is posted. (Exhibit 1).

175.    The content of Exhibit 1 is defamatory because it harms Plaintiff's reputation, lowers him in the estimation of the community, and deters third persons from associating or dealing with him.

176.    Any reader of the defamatory material would understand its defamatory meaning.

177.    Any reader of the defamatory statements would understand an intent by Defendant to apply the content of Exhibit 1 to Plaintiff.

178.    As a direct and proximate result, Plaintiff has sustained personal injuries, including but not limited to depression, anxiety, insomnia, irreparable damage to his reputation, and loss of standing in the community.

179.    Plaintiff continues to sustain these injuries due to the ongoing and widespread dissemination of Defendant's falsehoods.

180.    Defendant's portrayal of the Plaintiff was reckless, willful, malicious, and so extreme and outrageous to warrant the imposition of punitive damages.

*WHEREFORE*, Plaintiff seeks the damages set forth in the *Ad Damnum* of the instant Complaint, *infra*.

## COUNT IV

### INTENTIONAL INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS

181.    The foregoing paragraphs are fully incorporated herein as though set forth at length.

182.    Defendant was aware that the Plaintiff had significant economic prospects.

183.    Defendant was aware that these prospects were related to Plaintiff's athletic ability.

184.    Defendant was also aware that these prospects were related to Plaintiff's actuarial and coding capabilities.

185.    By defaming the Plaintiff, Defendant intended to interfere with the Plaintiff's prospective contractual relationships.

186.    Defendant had no justification or legitimate reason, financial or otherwise, for interfering with Plaintiff's prospective contracts of employment other than her to stop him from being successful.

187.    As a direct and proximate result of Defendant's intentional conduct as aforesaid, Plaintiff has sustained actual and consequential damages in excess of $75,000.00.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendant for actual, consequential, and punitive damages in an amount in excess of $75,000.00 and grant such other legal and equitable relief as the Court deems just and appropriate.

## COUNT V

## TEMPORARY RESTRAINING ORDER

188.    The averments of the foregoing paragraphs are hereby incorporated by reference as if set forth fully herein.

189.    Plaintiff makes reference to, and incorporates herein, as if set forth at all based on the length, his request for a Temporary Restraining Order filed contemporaneously with this Complaint.

190.    In the underlying case, Plaintiff has a reasonable probability of success on the merits.

191.    Plaintiff will be irreparably injured by denial of the Temporary Restraining Order.

192.    Plaintiff will suffer greater harm than Defendant if the Temporary Restraining Order is not granted.

193.    In this case, a Temporary Restraining Order is in the public interest.

WHEREFORE, Plaintiff request that this Court grant a Temporary Restraining Order against the Defendant in accordance with Plaintiff's Motion and Memorandum of Law in support thereof.


## *AD DAMNUM* CLAUSE/PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that this Court enters an order providing that:

a.      Defendant is to compensate Plaintiff, and make Plaintiff whole for any and all economic losses suffered by him

b.      Plaintiff is to be awarded actual damages, as well as damages for the pain, suffering, and humiliation caused to him by Defendant's actions;

c.      Plaintiff is to be awarded punitive damages as permitted by applicable law in an amount believed by the trier of fact to be appropriate to punish the Defendant or her willful, deliberate, malicious, and outrageous conduct and to deter Defendant and other individuals similarly situated from engaging in such misconduct in the future;

d.      The Defendant is to ensure that all negative references to Plaintiff, in any statement, posting, or Internet filing and/or in any document are immediately removed;

e.      Plaintiff is to be accorded any and all other equitable and legal relief the Court, including but not limited to a Temporary Restraining Order;

f.      Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees and costs as provided by applicable Federal and State law;

g.      The Court will maintain jurisdiction over the instant action to ensure Defendant's

compliance with its orders therein;

h.      Plaintiff's claims are to receive a trial by jury to the extent allowed by applicable

law;

i.      Plaintiff has also endorsed this demand on the caption of this Complaint in

accordance with Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

KOLMAN LAW, P.C.


BY:    s/ *Timothy M. Kolman*
Timothy M. Kolman, Esquire
Attorney for Plaintiff
414 Hulmeville Avenue
Penndel, PA 19047
(215) 750-3134


April 24, 2022